CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

JAN 14 2010

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RONALD E. WOOLWINE, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 7:08CV00529 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| FREDERICK M. MOSES, M.D., et al., | ) By: Hon. Glen E. Conrad |
| | ) United States District Judge |
| Defendants. | ) |

The plaintiff, Ronald E. Woolwine, filed this civil rights action under 42 U.S.C. § 1983, asserting that he received constitutionally inadequate medical care while he was incarcerated at the New River Valley Regional Jail in Dublin, Virginia. The case is presently before the court on the motion for summary judgment filed by defendants Megan Friend and Tina Palmer. For the reasons that follow, the court will grant the motion for summary judgment.

## Factual Background

On December 18, 2007, Woolwine was arrested for an alleged probation violation. He was subsequently taken to the New River Valley Regional Jail, where he was booked by McGinley Whittaker. During the booking process, Woolwine advised Whittaker that he had used cocaine and Lortab prior to being arrested. Whittaker noted this information on Woolwine's booking observation report.

Seven days later, on December 25, 2007, Woolwine began to experience nausea and back pain. He was transported to the jail's medical department at approximately 2:48 p.m., where he was seen by defendant Megan Friend.[1] Friend took Woolwine's vital signs, which were within normal limits, and made the following notation in Woolwine's medical records:

---

[1] Friend is a licensed practical nurse.

> IM [Inmate] to medical c/o pain in umbilical area. IM states it's not really
> pain it's just nausea. VS Temp 96° pulse 57 O2 99% BP 130/88, IM states
> he used cocaine and abused percocet and lortabs. VS normal told IM if
> symptoms got worse to come back to medical.

(Defs.' Ex. E). Friend discharged Woolwine back to the general population, but told him to return to the medical department if his symptoms worsened.

Woolwine subsequently returned to the medical department less than two hours later, at approximately 4:38 p.m. He was escorted to the medical department by Sergeant Brian Golden, who had observed Woolwine vomiting in his cell, and had noticed that Woolwine was pale and sweaty.

Woolwine was again seen by Friend in the medical department. Based on the nature of Woolwine's complaints – nausea and vomiting – and his history of cocaine and narcotics abuse, Friend believed that Woolwine was suffering from drug withdrawal. Consequently, Friend admitted him to the medical department, placed him on the jail's drug withdrawal protocol,[2] and made the following notation in Woolwine's medical records:

> IM back to medical, vomiting, housed in medical started on withdrawal
> protocol, see physicians orders/standing orders.

(Defs.' Ex. E; see also Woolwine Dep. at 39-40 ("[S]he was going to keep me in medical to detox for three days.")). The withdrawal protocol included the administration of Vistaril in decreasing doses, along with Extra Strength Tylenol, Phenergan, and Clonodine when needed. Friend entered orders for these medications in Woolwine's medical file.

---

[2] It is undisputed that nurses at the jail were permitted to place inmates on the withdrawal protocol without prior approval from the jail's physician.

2

Prior to ending her shift at 6:00 p.m., Friend administered Woolwine's first dose of Vistaril. She also gave him Extra Strength Tylenol. In her shift report, Friend noted that Woolwine was on the withdrawal protocol, that she had administered his first dose of Vistaril, and that he would continue to be monitored.

Friend was relieved by Tina Palmer, who covered the evening shift on December 25, 2007.[3] Palmer administered Vistaril and Extra Strength Tylenol to Woolwine at approximately 7:30 p.m. Later that night, while conducting rounds, Palmer saw Woolwine squatting in front of the toilet. Woolwine told Palmer that he was sick and that he had vomited. According to the medical records, Palmer subsequently administered 25 milligrams of Phenergan in accordance with the orders in Woolwine's medical file.

Palmer was relieved by Friend at approximately 6:00 a.m. on December 26, 2007. Palmer advised Friend that Woolwine had vomited during her shift, and that she had given him Phenergan. During Friend's subsequent shift, Friend administered Vistaril and Extra Strength Tylenol to Woolwine.

Palmer returned to work at approximately 6:00 p.m. on December 26. The shift report indicates that Woolwine appeared "ok" at that time. (Defs.' Ex. K). Palmer subsequently administered Vistaril and Extra Strength Tylenol to Woolwine. When Friend took over for Palmer at approximately 6:00 a.m. on December 27, 2007, Friend noted that Woolwine was not complaining, that his condition had not worsened, and that he would be returned to the jail's general population.

---

[3] Palmer is a certified nursing assistant and a medical technician. At the time of the events in question, her last name was Groseclose.

3

Officer Andrew Hawks was assigned to the medical department on the morning of December 27. He testified at his deposition that he heard Woolwine complain of stomach pain approximately three or four times during his shift. When Hawks advised Friend that Woolwine was complaining of pain, Friend replied, "okay." (Hawks' Dep. at 12). Although Friend administered Vistaril to Woolwine on the morning of December 27, the record contains no indication that he was given any Extra Strength Tylenol for pain.

Woolwine was escorted from the medical department with three other inmates by Officer Hawks at approximately 7:44 a.m. According to Woolwine's cellmate, Jeffrey Blevins, Woolwine appeared pale and dehydrated at that time, and, over the course of the day, became so weak that he was unable to get out of bed to vomit in the toilet. Consequently, Woolwine had to vomit in milk cartons.

Officer Hawks and Officer Robert Miller ultimately transported Woolwine back to the medical department at 3:31 p.m. on December 28, 2007. According to Hawks' deposition testimony, Woolwine's condition had worsened from the day before and his complaints had become "more intensified." (Hawks' Dep. at 21-22). Woolwine's cellmate advised Hawks that Woolwine had been sick the entire day. Additionally, Woolwine reported that he had been vomiting, that his stomach had been hurting, and that he had not been able to get out of bed. While in Woolwine's cell, Hawks saw emesis in the toilet and in milk cartons, which looked like coffee grounds.

Woolwine was examined in the medical department by Timothy Thompson, R.N. Thompson made the following notation in Woolwine's medical records:

> C/o nausea & vomiting. Is on W/D protocol. IM alert & oriented. Pallor normal. BS x 4q. PERRL. Dose Pepto given to IM. Encouraged to [increase] fluids and foods as tolerated. Will monitor in medical.

(Defendants' Ex. E). Woolwine's pulse was 122 and his blood pressure was 108/90.

Thompson's shift ended at approximately 6:00 p.m. on December 28. As he was driving home, Thompson became concerned that Woolwine might require further assessment. Consequently, Thompson called the jail and asked that Woolwine be taken to the hospital.

Woolwine was ultimately transported to Pulaski Community Hospital, where he underwent exploratory surgery. The surgery revealed that Woolwine was suffering from ischemic bowel disease. A large percentage of Woolwine's intestines was necrotic and had to be removed. According to the amended complaint, Woolwine now requires total parenteral nutrition.

Woolwine has designated Jane Grametbaur, R.N., and Joseph E. Paris, Ph.D., M.D., as expert witnesses. Grametbaur is a registered nurse who is currently employed in a supervisory capacity at the Orange County Jail in Orange County, California. In her expert report, dated August 21, 2009, Grametbaur opined that Woolwine "received care that was far below the standard of the community" from "the time [he] was booked into [the jail]," and that Woolwine's evaluations by medical staff members were "gross[ly] inadequate." (Grametbaur Report at 10-11). Grametbaur emphasized that the jail physician was never notified of Woolwine's condition; that Woolwine's condition and/or progress was not properly documented; that the nurses instituted a protocol for withdrawal without obtaining an appropriate medical history or performing an adequate physical examination; and that "[t]heir incorrect assessment of Mr.

Woolwine's condition constitute[d] a gross deviation from the standard of care." (Grametbaur Report at 11).

Dr. Joseph Paris is a physician licensed to practice in Florida and Georgia, who specializes in internal medicine and correctional health care. In his amended expert report, dated November 13, 2009, Dr. Paris opined that Woolwine "received care so bad it amounted to no care at all." (Paris Report. at 6). To support this opinion, Dr. Paris emphasized that Friend never performed a physical examination of Woolwine's abdomen; that Friend incorrectly diagnosed Woolwine as suffering from cocaine withdrawal; that Woolwine was never referred to, or seen by, a physician at the jail; that Woolwine's vital signs were not adequately monitored; and that Woolwine ultimately "presented to the [emergency room] later in his course and with a much more advanced process." (Paris Report at 6).

Woolwine has also submitted excerpts of a transcript from the deposition of Martin Anthony Fogle, M.D., who is identified in Woolwine's brief in opposition to the summary judgment motion as his "vascular surgeon expert." (Pl.'s Br. in Opp. at 8). During the deposition, Dr. Fogle testified that when Woolwine first began displaying symptoms on December 25, 2007, his intestine "was compromised," but "was not entirely dead at that point," and that Woolwine's pain, "while waxing and waning," could have been "very severe" at times. (Fogle Dep. at 72). Dr. Fogle testified that by December 26, 2007, Woolwine's pain "was not going to simply . . . go away," and that he was likely experiencing nausea and a lack of appetite. (Fogle Dep. at 73). Dr. Fogle further testified that, by December 27, 2007, Woolwine would have had persistent discomfort and nausea, and that his pain would have gradually increased. Dr.

Fogle opined that Woolwine's overall medical condition worsened from December 25, 2007 to December 27, 2007.

## Procedural History

The plaintiff filed this civil rights action on September 25, 2008. In his amended complaint, filed on July 27, 2009, Woolwine alleged that Dr. Frederick Moses, Mary Chopin, Tina Palmer, Megan Friend, and Timothy Thompson acted with deliberate indifference to his serious medical needs while he was incarcerated at the jail, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Dr. Moses and Timothy Thompson have since been dismissed from the case, leaving Tina Palmer, Megan Friend, and Mary Chopin as defendants.

On November 25, 2009, Palmer and Friend filed the instant motion for summary judgment. The court held a hearing on the motion on December 21, 2009. The motion has been fully briefed and is now ripe for review.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable

to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

In his amended complaint, Woolwine asserts a claim against the defendants under 42 U.S.C. § 1983, which imposes civil liability on any person acting under color of state law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. Specifically, Woolwine alleges that the defendants violated his rights under the Due Process Clause of the Fourteenth Amendment, by acting with deliberate indifference to his serious medical needs.[4]

As a general rule, "[o]nly governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." Young v. City of Mount Ranier, 238 F.3d 567, 574 (4th Cir. 2001) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998)). The degree of culpability on the part of correctional officials that is sufficient to shock the conscience depends on the particular circumstances of the case. Id. "In cases where the government is accused of failing to attend to a detainee's serious medical needs, . . . conduct that amounts to deliberate indifference . . . is viewed as sufficiently shocking to the conscience that it

---

[4] Woolwine also alleges that the defendants' conduct violated his rights under the Eighth Amendment. However, because it appears from the record that Woolwine was a pretrial detainee at the time of the events in question, the Eighth Amendment does not apply. Instead, Woolwine's claims pertaining to his care and treatment arise solely under the Due Process Clause of the Fourteenth Amendment. See Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir. 1997). Nonetheless, a pretrial detainee's due process rights are "co-extensive" with a convicted prisoner's rights under the Eighth Amendment. Turner v. Kight, 121 Fed. Appx. 9, 13 (4th Cir. 2005) (citing Hill v. Nicodemus, 979 F.2d 987, 990-992 (4th Cir. 1992)).

can support a Fourteenth Amendment claim." Parrish v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004) (internal citation and quotation marks omitted).

The standard for deliberate indifference is "very high" – "a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Instead, an official acts with deliberate indifference only when she "knows of and disregards" the risks posed by the detainee's serious medical needs. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In order to be liable under this standard, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." Id. "Stated somewhat differently, deliberate indifference requires a showing that the defendants <u>actually knew of</u> and <u>disregarded</u> a substantial risk of serious injury to the detainee or that they <u>actually knew of</u> and <u>ignored</u> a detainee's serious need for medical care." Parrish, 372 F.3d at 302 (internal citation and quotation marks omitted) (emphasis in original). The United States Court of Appeals for the Fourth Circuit has explained that liability under this standard requires two showings:

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers <u>should have</u> recognized it; they actually must have perceived the risk. Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). Second, the evidence must show that the official in question subjectively recognized that [her] actions were "inappropriate in light of that risk." Id. As with the subjective awareness element, it is not enough that the official <u>should have</u> recognized that [her] actions were inappropriate; the official actually <u>must have</u> recognized that [her] actions were insufficient. See Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001).

Id. at 303 (emphasis in original); see also Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Applying the foregoing principles, and having thoroughly considered the arguments asserted by Woolwine and the moving defendants, the court is constrained to conclude that

9

Friend and Palmer are entitled to summary judgment. Without a doubt, the record reveals that Woolwine was suffering from a serious medical condition – ischemic bowel disease – during the time period in question. His claim against Friend and Palmer fails, however, because Woolwine has produced no evidence that they actually knew of and disregarded a serious risk of harm to Woolwine, or that they actually knew of and ignored his serious need for medical care. Parrish, 372 F.3d at 302. At most, Woolwine's evidence, including the reports from his expert witnesses, suggests that Friend acted negligently in diagnosing Woolwine as suffering from withdrawal symptoms, and that both Friend and Palmer provided negligent treatment. Neither a missed diagnosis nor negligent treatment, however, is sufficient to establish a violation of Woolwine's constitutional rights. See Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998); Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).

In response to the defendants' summary judgment motion, Woolwine relies heavily on two documents that he submitted with his brief in opposition, the first, entitled "Narcotic Withdrawal," and the second, entitled "S/O Narcotic/Opiate/Analgesic Detox." (Pl.'s Ex. I and K). While Woolwine contends that these documents set forth the requirements for the treatment of drug withdrawal at the New River Valley Regional jail during the time period in question, and that both Friend and Palmer failed to comply with the all of the standards set forth in the documents, Woolwine has not adduced any evidence that these documents were, in fact, in place at the jail in December of 2007.[5] Moreover, even if the documents were in effect during the time

---

[5] In response to requests for admission by the plaintiff, neither Palmer, Timothy Thompson, nor Dr. Frederick Moses, the purported author of the protocol, was able to admit or deny whether the protocol and standing order were authentic or in effect at the jail in December of 2007, and defendant Friend specifically denied that the documents were in effect during the time period in question.

10

period in question, it is clear from established Fourth Circuit precedent that a correctional official's failure to follow established protocols, while perhaps probative of negligence, is not sufficient to establish deliberate indifference. See, e.g., Rich v. Bruce, 129 F.3d 336, 339 (4th Cir. 1997) (holding that the fact that the defendant officer violated prison security rules was insufficient to establish a violation of the inmate's constitutional rights); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990) (holding that the defendants' "failure to follow procedures established for the general protection and welfare of inmates [did] not constitute deliberate disregard for the medical needs of a particular intoxicated individual").

Along the same lines, the court is unpersuaded by Woolwine's contention that Friend believed that he was faking his symptoms.[6] Even if Friend was, in fact, of the opinion that Woolwine was malingering or exaggerating the severity of his symptoms, such evidence fails to translate to a finding that she acted with deliberate indifference to Woolwine's serious medical needs. In Johnson v. Quinones, 145 F.3d 164, 166 (4th Cir. 1995), the plaintiff argued that the fact that one of the defendant physicians had diagnosed him as a malingerer was evidence that the physician was deliberately indifferent to the plaintiff's needs. The Fourth Circuit expressly rejected the argument, emphasizing that the diagnosis was "more consistent with [the physician's] claims that he simply missed the diagnosis," and that the malinger diagnosis was "not convincing evidence of deliberate indifference and [did] not create a genuine issue of material fact." Johnson, 145 F.3d at 169; see also Perrin v. Williams, 1998 U.S. App. LEXIS 32638, at *8 (4th Cir. Dec. 31, 1998) (holding that the defendant's repeated accusations that Perrin was faking his illness "in fact

---

[6] According to a written statement from Woolwine, Friend accused him of "faking it" when he complained of pain on December 26, 2007. (Pl.'s Ex. A).

11

establish[ed] that [the defendant] was not deliberately indifferent," since "a prison official is not liable if he knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent").

In sum, as to both Friend and Palmer, there is simply no evidence from which a reasonable jury could find that either of these defendants was aware that Woolwine was suffering from ischemic bowel disease or any other serious medical condition that required treatment measures other than those that were afforded by them. The court concludes, as a matter of law, that neither of these defendants could be found to have acted with deliberate indifference to Woolwine's medical needs and that, at most, they were negligent in failing to appreciate the possibility of a more pervasive, potentially life-threatening medical problem. Accordingly, the court will grant their motion for summary judgment.

## Conclusion

For the reasons stated, the court will grant the motion for summary judgment filed by Friend and Palmer. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 14th day of January, 2010.

_____
United States District Judge